**[J-89-2024] [OAJC:McCaffery, J.]**
IN THE SUPREME COURT OF PENNSYLVANIA
MIDDLE DISTRICT

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | No. 5 MAP 2024 |
| | : | |
| | : | Appeal from the Order of the |
| v. | : | Superior Court at No. 511 MDA |
| | : | 2022 entered on July 11, 2023 |
| | : | Affirming the Order of the |
| MANUEL ALEJANDRO RONDON | : | Cumberland County Court of |
| | : | Common Pleas at No. CP-21-CR- |
| | : | 0001073-2020 entered on March 8, |
| APPEAL OF: STEPHEN HOBBS, SURETY | : | 2022 |
| | : | |
| | : | ARGUED: November 19, 2024 |

**CONCURRING AND DISSENTING OPINION**

JUSTICE WECHT                                 **DECIDED: August 19, 2025**

A breakdown in the Cumberland County Court of Common Pleas' scheduling system caused the trial court in this case mistakenly to revoke Manual Alejandro Rondon's bail. Rondon's bail had been secured by a local bail bondsman, Stephen Hobbs. Upon learning that the revocation was erroneous, the trial court promptly, and with Hobbs' express permission, reinstated Rondon's bail. The question here is whether such reinstatement triggers the clause in 42 Pa.C.S. § 5747.1 that requires a bail bondsman's "written consent" in order to remain as surety for a defendant whose bail has been reinstated. The Opinion Announcing the Judgment of the Court ("OAJC") holds that it does. I disagree. However, because the OAJC affirms the order of the lower court for different reasons, I concur in the result.

Section 5747.1 is a nuanced statute that governs the rights and duties of the relevant parties, including bail bondsmen, when bail is forfeited due to a defendant's

failure to appear on a scheduled court date. To contextualize the analysis, it is helpful first to review the typical scenario in which a bail bondsman becomes involved in a criminal case.

Whether through the execution of an arrest warrant[1] or through a warrantless felony arrest,[2] criminal cases ordinarily commence when police officers arrest a suspect. The officers then transport the suspect to the county jail, where he is searched, fingerprinted and photographed, and, if he consents, interrogated. The suspect is detained in a holding cell until his initial court appearance. At this hearing—the preliminary arraignment[3]—a magisterial district judge ("MDJ") presides.[4] Once the suspect, now a defendant, is called to the arraignment, he is provided a copy of the criminal complaint filed against him.[5] The MDJ must read the complaint in open court.[6] The MDJ informs the defendant of the right to counsel, the right to a preliminary hearing, and, if eligible, the right to bail.[7] The MDJ notifies the defendant of the time, date, and

---

[1]   *See generally* Pa.R.Crim.P. 502.

[2]   *See* Pa.R.Crim.P. 502(2).

[3]   *See generally* Pa.R.Crim.P. 540.

[4]   The term "magisterial district judge" is used in all Pennsylvania counties except for Philadelphia, where the jurist who presides over preliminary arraignments is called a "Philadelphia arraignment court magistrate." *See* Pa.R.Crim.P. 103 (defining "bail authority").

[5]   Pa.R.Crim.P. 540(C). If the defendant had been apprehended via an arrest warrant, he also is entitled to a copy of the warrant and its supporting affidavit. Pa.R.Crim.P. 540(D).

[6]   Pa.R.Crim.P. 540(F); *see also* Pa.R.Crim.P. 103 (defining "bail authority").

[7]   Pa.R.Crim.P. 540(F)(1)-(3).

location of the preliminary hearing, and warns the defendant of the consequences that attend failure to appear at that hearing.[8]

The MDJ must then make a bail determination. Assuming that the defendant is eligible for bail,[9] the MDJ must consider a litany of factors, including the nature of the charges, the defendant's employment status and financial ability to post bail, the defendant's family ties to the community, the length of the defendant's residence in the community, the defendant's age, character, reputation, and mental health, whether the defendant suffers from an addiction to drugs or alcohol, the defendant's past compliance with bail conditions, whether the defendant has a history of flight from prosecution or has attempted to escape custody, the defendant's history of criminal convictions and use of false identifications, and any other factors that the MDJ deems pertinent to the defendant's likelihood to abide by any conditions of release.[10] If, after considering these factors, the MDJ determines that the defendant is eligible for bail, the MDJ then must settle on the type of bail that best "ensure[s] that the defendant will appear at all subsequent proceedings and comply with the conditions of the bail bond."[11] A defendant

---

[8] Pa.R.Crim.P. 540(G).

[9] Not all arrestees are entitled to bail. For instance, Article I, Section 14 of the Pennsylvania Constitution states that "[a]ll prisoners shall be bailable by sufficient sureties, unless for capital offenses or for offenses for which the maximum sentence is life imprisonment or unless no condition or combination of conditions other than imprisonment will reasonably assure the safety of any person and the community when the proof is evident or presumption great . . . ." PA. CONST. art. 1, § 14.

[10] *See* Pa.R.Crim.P. 523(A)(1)-(10). The MDJ may not consider in the bail determination the suspect's refusal to confess to the crimes charged or to otherwise assist in the investigation against him, Pa.R.Crim.P. 523(B), nor can the MDJ rely upon the suspect's prior arrests that did not lead to convictions. *See generally Commonwealth v. Berry*, 323 A.3d 641, 648 (Pa. 2024) (explaining that "evidence of a defendant's arrest record is inadmissible and irrelevant in nearly every criminal law context").

[11] Pa.R.Crim.P. 524(A). A "bail bond" is a "document whereby the defendant agrees that while at liberty after being released on bail, he or she will appear at all subsequent (continued…)

may be released on his own recognizance,[12] on non-monetary conditions that the MDJ believes are reasonably necessary to ensure the defendant's compliance,[13] on an unsecured bail bond,[14] on nominal bail,[15] or, relevant here, on a monetary condition.[16]

If a monetary condition of release is deemed necessary, the MDJ must decide how much money, when posted, will likely ensure the defendant's future appearance. In doing so, the MDJ considers the same criteria that inform the initial bail eligibility assessment,[17] as well as the defendant's ability to pay.[18] Once the monetary condition is set, the defendant can satisfy it by paying the full amount in cash.[19] Alternatively, if the MDJ determines that a partial payment (up to ten percent) of the full amount will suffice to ensure the defendant's appearance at all future court hearings, the defendant may post such a percentage payment in lieu of the full amount.[20] If the defendant cannot pay the

---

proceedings as required and comply with all the conditions of the bail bond." Pa.R.Crim.P. 525(A).

[12]     Pa.R.Crim.P. 524(C)(1).

[13]     Pa.R.Crim.P. 524(C)(2). Such conditions may include reporting requirements, restrictions on travel, or any other condition that the MDJ concludes is reasonably necessary to ensure the defendant's compliance with the terms of the bail bond. Pa.R.Crim.P. 527(A).

[14]     Pa.R.Crim.P. 524(C)(3). When released on an unsecured bond, the defendant's release is "conditioned upon the defendant's written agreement to be liable for a fixed sum of money if he or she fails to appear as required or fails to comply with the conditions of the bail bond." *Id.* Notably, the defendant does not have to post any money or property as security for this type of bond. *Id.*

[15]     Pa.R.Crim.P. 524(C)(4).

[16]     Pa.R.Crim.P. 524(C)(5).

[17]     *See generally* Pa.R.Crim.P. 523.

[18]     Pa.R.Crim.P. 528(A)(1)-(2).

[19]     Pa.R.Crim.P. 528(D)(1).

[20]     Pa.R.Crim.P. 528(C).

bail in cash, he can satisfy the bail by posting collateral, such as government bonds[21] or real estate.[22]

When a defendant cannot satisfy his bail obligation in any of these ways, he may seek the assistance of a bail bondsman.[23]  A bail bondsman—a "person who engages in the business of giving bail as a surety for compensation"[24]—guarantees the bail in the defendant's stead, allowing the defendant to be released from pre-trial incarceration.  In exchange, the defendant pays the bondsman a fee (sometimes secured by collateral), usually a set percentage of the overall amount of the bail being posted by the bondsman, and enters into a contract with that bondsman in which the defendant promises, among other things, to appear at all future court hearings.  This relationship benefits both parties. For the bail bondsman, it generates income.  For the defendant, it generates release from jail, whereupon the defendant can more easily meet with his lawyer, prepare a defense, locate witnesses, and address the other necessities of life.  But this relationship is mutually beneficial only insofar as the defendant makes all of his court appearances. When the defendant does not keep his end of the bargain, things change.

The protocols following a defendant's failure to appear for a scheduled court hearing are prescribed by 42 Pa.C.S. § 5747.1.[25]  Invocation of the statute is

---

[21]    Pa.R.Crim.P. 528(D)(2).

[22]    Pa.R.Crim.P. 528(D)(3)-(4).

[23]    Pa.R.Crim.P. 528(D)(5).

[24]    42 Pa.C.S. § 5741.

[25]    The Rules of Criminal Procedure also outline the procedures attendant to a defendant's violation of the terms of a bail bond.  *See* Pa.R.Crim.P. 536(2).  Those rules are consistent with the statute at issue herein, 42 Pa.C.S. § 5747.1.

discretionary, at least at first. The statute does not mandate that the bail authority[26] issue a bench warrant for the defendant's arrest, nor does it require that the defendant's bail be revoked. Subsection 5747.1(a) states that an absent defendant's bail "*may* be revoked."[27] If the bail authority chooses to revoke the defendant's bail, that authority must then provide notice to both the defendant and the bail bondsman (if one was retained by the defendant) of the revocation as well as the intent to have the bail forfeited.[28]

The notice starts a ninety-day clock. On the ninety-first day, if the defendant has not been apprehended, the notice converts into a "judgment of forfeiture."[29] The bail bondsman "immediately" must pay the forfeited bail amount.[30] A bail bondsman can avoid this result either by finding and apprehending the absconding defendant or by discovering that the defendant is already in custody in another jurisdiction and informing the court of the same. Either of these actions will implicate the terms and conditions of Subsection 5747.1(b)(2). In full, that provision states:

> Payment of forfeited undertaking shall be made directly to the office of the clerk not later than the close of business on the 91st day following the

---

[26] While the initial bail is set by an MDJ, jurisdiction over that bail advances through the court system with the defendant's criminal case. Thus, the discussion necessarily shifts from references to an MDJ to references to a bail authority. A "bail authority" is "the magisterial district judge, magistrate, Philadelphia arraignment court magistrate, or the judge with jurisdiction over the case who is authorized by law to set, modify, revoke, or deny bail." Pa.R.Crim.P. 103.

[27] 42 Pa.C.S. § 5747.1(a) (emphasis added); *see also* Pa.R.Crim.P. 536(2)(a) ("When a monetary condition of release has been imposed and the defendant has violated a condition of the bail bond, the bail authority *may* order the cash or other security forfeited and state on the record the reasons for doing so.")(emphasis added)).

[28] *See* 42 Pa.C.S. § 5747.1(a).

[29] 42 Pa.C.S. § 5747.1(b)(1).

[30] *Id.* If the bail bondsman does not immediately remit payment, the district attorney (or county solicitor) may "commence[] proceedings to suspend or nonrenew the license of the bail bondsman . . . ." *Id.*

service of the notice of revocation. If the defendant has been recovered and placed into custody through the efforts of the bail bondsman or proof has been provided to the court that the defendant was discovered by the bail bondsman to be in custody in another jurisdiction prior to the 91st day, no payment of the forfeited undertaking shall be required. If the defendant is placed into custody or discovered to be in custody, the court shall set aside the bail revocation and may release the defendant with the reinstitution of bail pursuant to the Pennsylvania Rules of Criminal Procedure. The bail bondsman shall not be continued by the court as surety on reinstated bail unless a written consent is signed by the bail bondsman agreeing to such extension of suretyship.[31]

Thus, if the bondsman locates or apprehends the defendant by the ninety-first day, then "no payment of the forfeited undertaking shall be required."[32] When the "defendant is placed into custody or discovered to be in custody," the bail authority "shall set aside" the initial bail revocation, and it "may release the defendant" by reinstating bail.[33]

Finally, the last sentence of the subsection completes this linear statutory sequence—a provision that lies at the center of the current dispute. If the bail authority reinstates a defendant's bail pursuant to Subsection 5474.1(b)(2), the bail bondsman is removed as surety for that defendant "unless a written consent is signed by the bail bondsman agreeing to such extension of suretyship."[34] The question before us today, distilled to its simplest form, asks whether the "written consent" provision is triggered every time a defendant's bail is reinstated, including a circumstance in which bail is

---

[31]    42 Pa.C.S. § 5747.1(b)(2).

[32]    *Id.*

[33]    *Id.* ("If the defendant is placed into custody or discovered to be in custody, the court *shall* set aside the bail revocation and *may* release the defendant with the reinstitution of bail pursuant to the Pennsylvania Rules of Criminal Procedure.") (emphasis added).

[34]    *Id.* ("The bail bondsman shall not be continued by the court as surety on reinstated bail unless a written consent is signed by the bail bondsman agreeing to such extension of suretyship.").

revoked mistakenly and then reinstated as a matter of course-correction, or whether that provision applies only as part of the specific statutory progression that is detailed above.

The OAJC discerns "facial validity"[35] in both interpretations, and considers both of them "reasonable."[36] The OAJC ultimately settles on the former interpretation rather than the latter. In the OAJC's view, the "written consent" term applies every time that a criminal defendant's bail is reinstated. But the statute does not say that.

In reaching this conclusion, the OAJC disregards the statutory language that precedes the term "written consent." Subsection 5474.1(b)(2) makes clear that "written consent" is required only when there has been a "reinstated bail."[37] The General Assembly did not define "reinstated bail," but the two sentences that precede those words provide context that indicates when the "written consent" provision applies. As outlined above, Subsection 5747.1(b)(2) has three main parts.[38] First, the statute states that, if the bail bondsman's efforts result in the apprehension and incarceration of the defendant, then the bail bondsman no longer is required to forfeit the bail amount, so long as the defendant was captured within ninety days. Next, the statute requires the trial court to vacate the bail revocation order and affords the trial court discretion as to how to proceed with the now-detained defendant. The court may reinstate the defendant's earlier bail. The court may set a higher bail. Or the court can deny bail if it determines that the defendant presents too great a risk now that he has demonstrated a propensity to flee.

---

[35]     OAJC at 11.

[36]     *Id.* at 12.

[37]     42 Pa.C.S. § 5474.1(b)(2).

[38]     There is a fourth part, which directs where the payment of a forfeited bail should be made, *see* 42 Pa.C.S. § 5747.1(b)(2) ("Payment of forfeited undertaking shall be made directly to the office of the clerk not later than the close of business on the 91st day following the service of the notice of revocation."), but that component of the statute has no relevance here.

The statute gives the bail bondsman the option to continue on as the surety for a person whose bail has been reinstated, but, to remain, the bondsman must agree to do so in writing.

Today's OAJC concludes that reading Subsection 5747.1(b)(2) as a singular interrelated paragraph would be absurd. This, the OAJC explains, is because, if we apply the statute as written, Subsection 5747.1(b)(2)'s protections would not extend to a surety that is not a bail bondsman. For instance, a non-bail bondsman surety that apprehends and returns a bail-skipping defendant within ninety days would not be relieved of the obligation to forfeit the bail amount.[39] The OAJC deems this result to be absurd and contrary to the underlying legislative intent.

The OAJC demonstrates that the statute could have been drafted with more precision and clarity. However, while many statutes are poorly written, not all of these are absurd. The relevant portion of Subsection 5747.1(b)(2) consists of three sentences. The first and third refer expressly to the rights and duties of bail bondsmen. The middle sentence does not. It is hardly absurd to construe the entire paragraph as applying to bail bondsmen, given that the General Assembly bookended the second sentence with provisions applying specifically to bail bondsmen. That a non-bail bondsman surety cannot reap the benefits of the statute is a consequence of the words that the General Assembly chose to write.

To discern absurdity, the OAJC extracts the middle sentence from the paragraph and reads it in isolation. Doing so, the OAJC then concludes that the General Assembly wrote three consecutive sentences that have nothing to do with each other. But that is not how we are instructed to read statutes.

---

[39] *See* OAJC at 16.

We are instead bound to give effect to all of the General Assembly's written terms.[40]  More importantly, "statutory language must be read in context, that is, in ascertaining legislative intent, every portion of statutory language is to be read 'together and in conjunction' with the remaining statutory language, 'and construed with reference to the entire statute' as a whole."[41]  Reading Subsection 5474.1(b)(2) as we are required to do, it is clear that the "written consent" provision applies after a particular sequence of events has unfolded.  Subsection 5747.1(b)(2) speaks to a certain type of reinstatement, one in which the defendant is in custody due to the efforts of the bail bondsman and in which the court has exercised its discretion to reinstate bail.  Under those circumstances, the General Assembly saw fit to provide the bail bondsman—the person whose money is subject to forfeiture and who has expended efforts to apprehend the defendant—with an opportunity to choose whether to remain as the surety for the defendant, a defendant who has shown himself to be a flight risk.  Subsection 5747.1(b)(2), read in context and as a whole, was designed to ensure that bail bondsmen:  (1) have both the incentive and the means to avoid forfeiting large sums of money when defendants abscond; and (2) are not forced against their will to continue serving as surety for such defendants upon their return to custody.  Subsection 5747.1(b)(2)'s "written consent" provision applies only within this particular statutory context.  Nothing in the text suggests that it applies to every reinstatement of bail, including reinstatement due to court error or a breakdown in the

---

[40]    See 1 Pa.C.S. § 1922(2) (mandating that, when interpreting a statute, a court must presume that the "General Assembly intends the entire statute to be effective and certain"); see also Commonwealth by Shapiro v. Golden Gate Nat'l Senior Care LLC, 194 A.3d 1010, 1034 (Pa. 2018) ("When interpreting a statute, courts must presume that the legislature did not intend any statutory language to exist as mere surplusage; consequently, courts must construe a statute so as to give effect to every word.").

[41]    Commonwealth v. Office of Open Records, 103 A.3d 1276, 1285 (Pa. 2014) (quoting Bd. of Revision of Taxes, City of Phila. v. City of Phila., 4 A.3d 610, 622 (Pa. 2010)).

court system. If the General Assembly intended the provision to have an application as broad as the OAJC presumes, it likely would not have elected to bury the relevant sentence at the end of a lengthy paragraph describing a very particular sequence of events.

The consequences of construing Subsection 5747.1(b)(2), as the OAJC does, to require written consent by a bail bondsman after every bail reinstatement, even when the initial bench warrant and bail revocation were in error, are both avoidable and unnecessarily punitive.[42] For the bail bondsman, the "written consent" provision serves two important functions. The first is notice. The bail bondsman is not a permanent fixture in a courtroom. Any number of things may occur in the bondsman's absence. A defendant might fail to appear. A hearing could be held. A bench warrant may issue. Thus, one obvious purpose of the "written consent" provision is to ensure that the bondsman is apprised of a situation in which he or she has a vested and substantial financial interest.

Second, when the defendant is at fault for the failure to appear, the provision affords the bail bondsman the choice of whether or not to continue as surety. As described above, for a fee, the bail bondsman wagers a substantial amount of money upon the defendant's promise to appear at all future court hearings. When the defendant, by his own actions, fails to appear, and breaks that agreement, the "written consent" provision ensures that the bail bondsman knows that that the defendant has become a flight risk and allows the bail bondsman to choose whether to continue as surety for such

---

[42] My reference to the consequences of the OAJC's interpretation here serves two aims. First, it shows that the OAJC's interpretation undermines the purposes of the bail system, as constructed by the General Assembly. Second, it demonstrates the improbability that the General Assembly intended such an unnecessarily punitive operation of Subsection 5747.1(b)(2). My analysis is not, as the OAJC suggests, an effort to reach a "preferred policy outcome." *See* OAJC at 10-11 n.9. I have no "preferred policy outcome." I do have a view of what the statute requires.

a defendant.  In other words, Subsection 5474.1(b)(2) safeguards a bail bondsman from being forced to double down on his wager on a defendant who no longer seems a safe bet.

But these interests are implicated only when the failure to appear is the result of the defendant's actions or choices.  When the defendant misses a hearing due to a court error or a breakdown in the court administration's scheduling system, the defendant has not broken the contract with the bail bondsman.  He has not proven himself to be a flight risk.  Such a defendant has abided by all of the terms of his release.  Thus, there would be no cause to inquire whether the bail bondsman desires to continue as surety.  No harm would loom for the bail bondsman in such a circumstance.

There would, however, be significant harm to the defendant in requiring written consent when the failure to appear was due to circumstances beyond the defendant's control.  In the OAJC's view, even a reinstatement of bail that restores the *status quo* after a court error triggers the "written consent" provision.  The bail bondsman gets the choice to step away from the situation.  The defendant does not get a choice.  He must go back to jail.  The fee that he paid to the bondsman is not refunded.  Due to no fault of his own, the defendant now must pay the restored bail amount, or he must find another bail bondsman.  If he cannot, he must remain in jail as he prepares for trial.  The blame for the failure to appear lies with the court, but it is the defendant that pays the penalty.  Subsection 5747.1(b)(2) does not mandate this unnecessary and punitive result.

Human errors, both unavoidable and avoidable, happen in the criminal justice system.  The circumstances that gave rise to the case before us were entirely avoidable.  It is apparently the regular practice of the Cumberland County Court Administrator to "move scheduled pre-trial conferences without notice given on the docket" or without

notice to the trial court.[43] One need not have a vivid imagination in order to envision the havoc that such a system can (and apparently does) create. Such havoc occurred here. The Court Administrator generated two separate notices for Rondon's pre-trial conference. One set the conference for September 29, 2020. The other scheduled it for October 1, 2020. Regardless of which was the correct date, the Court Administrator rescheduled the conference for October 5, 2020. While the Court Administrator informed Rondon's counsel of this, he or she did not inform the trial court of the change or formally amend the court docket for the case. Thus, when Rondon did not appear on September 29, the trial court issued a bench warrant.

The chaos continued. Unaware of the mix-up, Rondon and his counsel appeared on October 5 before the court for what they believed was the pre-trial conference. The Commonwealth also appeared on that date, but the assistant district attorney thought they were there for a bench warrant hearing. All the while, the trial court was prepared to conduct a call of the list. This confusion results from Cumberland County's ill-conceived practice of allowing its Court Administrator extemporaneously to shuffle the court's calendar. It would be wise to end this practice.

A plain reading of the natural progression of Subsection 5474.1(b)(2) limits its "written consent" provision to circumstances in which a defendant who has failed to appear at a court hearing is placed in custody due to the efforts of the bail bondsman, or is discovered to be in custody already, and the court has exercised its discretion to reinstate that defendant's bail. The statute does not speak to any other circumstance, and should not be extended beyond its plain terms. Because the OAJC stretches the statute beyond its terms and its underlying intent, I do not join its analysis. However, because the OAJC ultimately affirms the orders of the lower courts, I concur in the result.

---

[43] Pa.R.A.P. 1925(a) Op., 6/30/2022, at 2 n.3.

Chief Justice Todd and Justice Donohue join this concurring and dissenting opinion.